OPINION OF THE COURT
Jacqueline B. Deane, J.
The respondent, Kenroy C., was arrested at the age of 14 and charged as a juvenile delinquent having committed acts that would be crimes if committed by an adult. The petition was filed on August 11, 2016, and on November 22, 2016, Ken-roy appeared before this court with his mother and made an admission to reckless endangerment in the second degree, a class A misdemeanor. The court ordered an investigation and report (I & R) to be prepared by the Probation Department and adjourned the case for disposition. The I & R was submitted on January 3, 2017 and recommends that the respondent receive an adjournment in contemplation of dismissal (ACD) for six months with a referral to prosocial programs based on a number of factors including that this was the respondent’s first delinquency finding and that the probation dispositional risk assessment instrument known as the Youth Level of Service (YLS) rated the respondent as low risk for recidivism. The presentment agency submitted a letter from the victim, Ms. I., describing the impact of the incident on her and the bills for which Ms. I. was requesting restitution. The court then held a *537 dispositional hearing where both sides relied entirely on the documentary evidence and argument at summation. The exhibits consisted of the I & R, YLS, victim’s impact statement, respondent’s school records and a letter written by the respondent to the victim.
The presentment agency’s position at disposition is that the least restrictive alternative for the respondent is an ACD with the condition that the respondent pay some portion of the restitution for medical expenses and clothing that the victim is requesting. The Attorney for the Child has argued for an ACD with no restitution given the very limited income of, and financial strains on, the respondent’s family. When the court asked both counsel to address the required threshold statutory dispositional question of whether the respondent was in need of supervision, treatment or confinement, the presentment agency argued that the question should be answered in the affirmative and the respondent in the negative.
The purpose of Family Court delinquency proceedings is to
“ensure that a juvenile delinquency adjudication is not treated as a crime. Delinquency proceedings are designed not just to punish the malefactor but also to extinguish the causes of juvenile delinquency through rehabilitation and treatment. Indeed, a hallmark of the juvenile justice system is that a delinquency adjudication cannot constitute a criminal conviction and a juvenile delinquent cannot be denominated a criminal. Rather, a Family Court adjudication is a civil proceeding, and its purpose is to ‘supervise and guide a troubled youth.’ ” (Green v Montgomery, 95 NY2d 693, 697-698 [2001] [internal quotation marks and citations omitted]; see also Matter of Quinton A., 49 NY2d 328, 335 [1980] [“(I)n most cases the Legislature has chosen not to brand the juvenile who commits an act which would otherwise be a crime a criminal, but recognizes that he is a person not fully responsible for his conduct”].)
The dispositional scheme of article 3 encapsulates this essential difference between juvenile delinquency and adult criminal prosecutions in the language of Family Court Act § 352.1. That part of the statute sets forth that a juvenile delinquency adjudication is a twofold process where the entry of a fact-finding, whether after trial or admission, is only the first step. In order for the adjudication to occur, the court must make an *538 additional finding at the dispositional stage, namely that the respondent “requires supervision, treatment or confinement.” (Family Ct Act § 352.1 [1].) It is only after this initial dispositional finding is made, that the respondent is adjudicated a juvenile delinquent and the court can go on to determine which dispositional alternative is appropriate.[1]
The fact that this threshold dispositional requirement exists makes clear that the mere fact that a child commits a delinquent act is not enough to establish the need for the court’s intervention. Rather, the act may simply have been a result of the youth’s age and lack of maturity—one of the many “mistakes” that children make simply because they are children and not because there is any particular need for treatment or supervision, much less confinement, beyond that which can be provided by the child’s family, school and community. Just as children are generally expected to learn from their non-criminal childhood mistakes without judicial support, the statute recognizes that even when the mistake satisfies the elements of a crime, it does not necessarily need to be addressed differently.[2] This question of whether supervision or treatment beyond that which is already being provided by the *539 family, school and community is needed is part of the analysis that the probation investigation is designed to assist the court in assessing. If the court finds that there is no need for treatment, supervision, or confinement, then the previously entered fact-finding is to be vacated and the petition dismissed. (Family Ct Act § 352.1 [2].)
In this case, there are a number of factors contained in the I & R that support a conclusion that the respondent is not in need of treatment, supervision or confinement pursuant to Family Court Act § 352.1 (2). First, this is Kenroy’s first contact with the juvenile justice system and he is over 15 years old. This incident happened in June 2016, over eight months ago, and the respondent has had no subsequent arrests since then. Kenroy has excellent school attendance both this year and all past semesters, averaging in the mid-90% attendance range and is passing all his classes.[3] Kenroy has a career goal of becoming an engineer and attending college. Kenroy’s mother, Ms. S., describes having a very respectful and close relationship with her son who presents no behavioral issues in the home. Kenroy does chores and obeys his curfew. Ms. S. has met Kenroy’s close friends and believes they are positive influences on him. None of them are involved in gangs or delinquent activity. Ms. S. explained that the instant offense is “not a typical representation of Kenroy’s behavior in the community and is an isolated incident.” (Court’s exhibit I at 5.) The report establishes that Kenroy generally shows maturity in his decision-making and that he is a positive member of his family, school and community. As a result of all of these factors, Ken-roy’s score on the probation dispositional evidence-based risk assessment was only a 3 out of a possible 42, which predicts an *540 extremely low risk for recidivism.[4] As in Matter of Kyung C. (169 AD2d 721 [2d Dept 1991]), the Probation Department report essentially concluded that the underlying incident was an isolated event and that the respondent receives adequate supervision by his mother.
The fact-finding here is for misdemeanor reckless endangerment where Kenroy was playing with a type of fireworks known as a Roman candle. The use of illegal fireworks around the July 4th holiday is the quintessential type of “risky” behavior that adolescents are known for and is consistent with their brain development.[5] While not at all uncommon, this act, like many youthful errors of judgment, is sufficiently dangerous that it can, as in this case, lead to injury. The respondent gave the following description of the incident in the I & R: Kenroy was with six of his friends all between the ages of 15-17. One of the friends gave him the Roman candle and another one lit it. Kenroy then began shaking it and saw sparks were coming out. When Kenroy saw a police car approaching he dropped the Roman candle, still lit, on the sidewalk and ran off. Kenroy stated that he was not aware that a stranger was hurt until he was arrested two weeks later. Kenroy told the probation officer that “he and his friends decided to play with the firework just for fun” and “stressed that [he] had no intentions of hurting anyone.” Kenroy stated that he “regrets dropping the firework on the sidewalk and now realizes it was bad judgment to play with a firework in a public area. Kenroy stressed that he has learned from his mistake and . . . feels sorry for the complainant and regrets that his unthoughtful actions hurt her.” (Court’s exhibit I at 2.) The court credits that Kenroy has expressed his sincere remorse about this unintended conse *541 quence both to the probation officer and in court at the time he made the admission in this case. Kenroy also expressed this remorse directly to the victim in the letter submitted as respondent’s exhibit A.
In her letter, Ms. I. describes coming home from work and passing a typical summertime evening scene of a group of teenage boys joking and horsing around on the sidewalk. The focus of their play was the Roman candle. Ms. I. decided to sit on the curb to look for something in her bag. At that moment, a passing police car stopped suddenly, causing the kids to scatter and the one with the roman candle happened to run in Ms. I.’s direction. According to the allegations in the petition, the respondent dropped the firework while running, apparently resulting in the freak occurrence of the sparks from the fireworks ricocheting off a nearby building and hitting Ms. I. It is clear from the victim’s statement, that Ms. I. was traumatized by this incident both because of the random nature in which it occurred and the injuries that she unfortunately suffered as a result. There is nothing this court can do to erase those consequences. The court did suggest that the victim engage in a restorative justice conference with the respondent, which Kenroy was willing to do, and which the court believes at least has the potential to offer Ms. I. some emotional healing around this event.[6] However, through the prosecutor, the victim has declined this offer. Ms. I. has requested full restitution for her out-of-pocket medical expenses and clothing damage totaling almost $2,000. While restitution can be a component of a delinquency disposition, monetary compensation for a victim’s injuries is not the aim of the juvenile justice system where awarding such restitution does not serve the primary purpose of rehabilitation. Ms. I. is free to seek damages through *542 a civil suit. However, given the limited financial means of the respondent’s family, the court finds it would not be consistent with the goals of rehabilitation to order it in this case. The respondent’s father died when Kenroy was only three years old. His mother financially supports him and his brother working as a home health aide seven days per week including three overnight shifts and earning only $19,000 annually. This income barely covers the family’s monthly rent. Causing this family additional financial stress through a restitution order when the respondent is too young to earn the money himself would not serve any greater societal purpose.
Aside from restitution, the dispositional outcomes Ms. I. requests in her statement are that the respondent acknowledge the distress he caused her and receive some form of consequence. The court finds that both of these outcomes have already occurred. As noted above, Kenroy has recognized and taken responsibility for the harm he caused on multiple occasions. Additionally, the court required that Kenroy read, with his counsel, the victim impact statement written by the complainant. Kenroy also experienced the consequences of being arrested and prosecuted in this court, which required multiple court appearances by both himself and his mother. The emotional and psychological stress of this on an adolescent boy with no prior contact with the juvenile justice system is significant. The court finds that Kenroy has sufficiently learned from the totality of this experience about the dangers of illegal fireworks and the harm that can result from them such that a delinquency finding at this time serves no lawful purpose. The court finds that the impact of having this case pending for eight months, along with reading about the victim’s firsthand experience, have been sufficient interventions to serve the Family Court’s goal of placing Kenroy on a successful path towards adulthood and therefore there is no need for any further court intervention or oversight at this time.[7]
As there was insufficient evidence adduced at the disposi-tional hearing to demonstrate by a preponderance of the evi *543 dence that the respondent was in need of supervision, treatment or confinement, the petition must be dismissed. (Family Ct Act §§ 350.3 [2]; 352.1 [2]; see Matter of Ejiro A., 268 AD2d 428, 428-429 [2d Dept 2000]; Matter of Jens P., 159 AD2d 707, 708 [2d Dept 1990].) The finding is hereby vacated and the matter is dismissed with prejudice and sealed.

. “In determining an appropriate order the court shall consider the needs and best interests of the respondent as well as the need for protection of the community. If the respondent has committed a designated felony act the court shall determine the appropriate disposition in accord with section 353.5. In all other cases the court shall order the least restrictive available alternative enumerated in subdivision one which is consistent with the needs and best interests of the respondent and the need for protection of the community.” (Family Ct Act § 352.2 [2] [a].)

. In fact, there are many “typical” youthful behaviors that could constitute crimes under the New York Penal Law. Examples include stealing candy or a snack from a store (petit larceny, Penal Law § 155.25), breaking an object out of anger or recklessness (criminal mischief, Penal Law § 145.00), or fighting with a peer or sibling (assault or attempted assault in the third degree, Penal Law §§ 110.00, 120.00). The reality of New York City’s juvenile justice system is that a teenager who lives in poverty and is black or Latino is much more likely to be arrested for these types of incidents than their white middle- or upper-class counterparts. (See 2014 Annual Report of New York State Juvenile Justice Advisory Group at 12 [“Disproportionate Minority Contact continues to be a persistent issue across the state. In New York City, 26 percent of the juvenile population was black in 2013 (most current available data), while 64 percent of the juveniles arrested in 2014 were black”]; see also A Report of the New York City Working Group on Reducing Disproportionate Minority Contact in the Juvenile Justice System, Vera Institute of Justice at 2 [Apr. 20, 2012] [“Roughly 90 percent of youth arrested for delinquency offenses are either black (58 percent) or Latino (32 *539 percent)—groups that constitute only 62 percent of the city’s youth population (28 and 34 percent, respectively)”]; Inside Out: Youth Experiences Inside New York’s Juvenile Placement System, Citizens’ Committee for Children of New York, Inc. at 10 [Dec. 2009] [“Historically, New York State has struggled with the issue of the overrepresentation of youth of color in the juvenile justice system .... 56% of the 12,393 youth under age 16 that were arrested were Black, 32% Hispanic and only 8% White. (4% Other)”].)

. The presentment agency has asked the court to consider the principal’s suspension Kenroy received on January 5, 2017. Since this was Kenroy’s first time being suspended and it was for a “B21” infraction which relates to a very broad category of in-school “disruptive behaviors,” it is not sufficient to change the court’s analysis. (See New York City Department of Education Discipline Code.)

. This is consistent with Kenroy’s score on the intake risk assessment completed at the beginning of this case where Kenroy received a score of -1 which is the lowest possible for risk of future delinquent acts or failure to appear.

. “It has been noted that ‘adolescents are overrepresented statistically in virtually every category of reckless behavior.’ ” (Roper v Simmons, 543 US 551, 569 [2005], quoting Arnett, Reckless Behavior in Adolescence: A Developmental Perspective, 12 Dev Rev 339 [1992]; see also brief of American Medical Association, American Psychiatric Association, et al. as amici curiae in support of respondent in Roper v Simmons, available at 2004 WL 1633549, *2-3 [“Cutting-edge brain imaging technology reveals that regions of the adolescent brain do not reach a fully mature state until after the age of 18. These regions are precisely those associated with impulse control, regulation of emotions, risk assessment, and moral reasoning. Critical developmental changes in these regions occur only after late adolescence”].)

. “A Restorative Justice approach is a response to crime and wrongdoing that empowers a group of people affected by an incident (victims, offenders and their supporters) to collectively decide how to repair the harm. Many types of programs are based on Restorative Justice principles, including victim-offender dialogue, impact panels, and restorative circles of all kinds.” (New York Peace Institute, Restorative Justice Approach, available at http://nypeace.org/criminal-matters/.) Restorative justice approaches have been found to give victims a level of satisfaction that they often do not receive from the traditional court process. (See T. Van Camp & J. Wemmers, Victim Satisfaction with Restorative Justice, 19 Int’l Rev Victimology 117, 117-143 [May 2013].)

. The I & R recommends, and Corporation Counsel has advocated for, an ACD. An ACD is not listed as a disposition under Family Court Act § 352.2 (1) and can only be issued prior to a finding under Family Court Act § 352.1. (See Family Ct Act § 315.3 [1].) However, by requiring continuing jurisdiction and oversight by this court for six months with “such terms and conditions as the court deems appropriate,” it implies a determination by the court that additional supervision is necessary. Given the court’s decision to the contrary, an ACD is not appropriate in this case.